UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LORENZO PUGLIESE,

                         Plaintiff,

        -against-

THE LONG ISLAND RAIL ROAD COMPANY,
& RICHARD COLE, CHRIS GLAUDINO,
NANCY GREER & GEROME PETRONOLIA,
*Individually & In Their Official Capacities,*

                        Defendants.
------------------------------------------------------------------X

                                          <u>MEMORANDUM & ORDER</u>

                                          01 CV 7174 (NGG)

GARAUFIS, United States District Judge.

       Plaintiff, Lorenzo Pugliese ("Pugliese" or "Plaintiff") filed the instant discrimination suit

against his employer, defendant Long Island Rail Road Company ("LIRR"), as well as ticket

clerk Richard Cole ("Cole"), station cleaner Chris Glaudino ("Glaudino"), Pugliese's former

manager Nancy Greer ("Greer"), and LIRR employee Gerome Petronolia/Jerome Petronilia

("Petronilia"), individually and in their official capacities (collectively "Defendants").  Pugliese

claims that Defendants engaged in a pattern and practice of discrimination on the basis of his

sexual orientation as a homosexual male and a perception that Pugliese did not conform to the

stereotypes of his gender, in violation of the Equal Protection Clause of the 14th Amendment of

the United States Constitution, and New York Human Rights Law.  Specifically, Pugliese brings

this lawsuit under 42 U.S.C. § 1983 ("§1983") and New York City Administrative Code Sec 8-

107.  (<u>See</u> Compl. 1-2.)  The parties conducted discovery under the supervision of Magistrate

Judge Marilyn Go.  Defendants LIRR, Petronolia, and Greer ("moving Defendants"),

subsequently moved for summary judgment as to each of Pugliese's claims.  (<u>See</u> Mem. L.

Support Def's. Mot. Summary Judgment ("Defs. Mot.").)  For the reasons set forth below,

moving Defendants' summary judgment is GRANTED in part and DENIED in part.  All claims

against defendants Cole and Glaudino are dismissed without prejudice as they were never served

with complaint and summons in this lawsuit.

I.    **BACKGROUND**

The following facts are presented in the light most favorable to the plaintiff, as is

required in a motion for summary judgment.  See Brennan v. Metro. Opera Assn Inc., 192 F.3d

310, 316 (2d Cir. 1999); Ertman v. United States, 165 F.3d 204, 206 (2d Cir. 1999).  Pugliese

began working for the LIRR in July 1979 and was promoted through the years until he became a

Ticket Agent in 2000, a supervisory position.  (Defs. Statement Material Facts Pursuant to R.

56.1 ("Defs. SMF") ¶ 1,2,4.)

**A.    1996 Incident: Bobby Wright**

Plaintiff first experienced anti-gay remarks on the job in 1996, while working as a ticket

clerk in Jamaica station.  (Pugliese Aff.)  The derogatory comments were made by a supervisor

Bobby Wright, after attempts by Mr. Wright to "get personal" were rebuked by Pugliese.  (Id.)

Pugliese reported these comments to Nancy Greer and Mercedes Commodore.  Mercedes

Commodore later told Pugliese that Bobby Wright would be required to attend sensitivity

classes; however, it is not clear if he ever did so.  Soon after this incident, plaintiff voluntarily

transferred out of that station.

**B.    November 2000 Incident: Robert Cole**

The next incident occurred in November 2000, while Mr. Pugliese was a ticket agent at

Flatbush Avenue station.   Around October 31, 2000, he reported ticket clerk Richard Cole for

violations of LIRR policy, including that Cole left the ticket office unalarmed, during which time the ticket case was open, the safe was open, and cash had been left in the money drawer. (Pugliese Dep. 18-20.) Cole was eventually disciplined, including six months suspension without pay. (Defs. SMF ¶ 11.) Within three days of the original incident, Metropolitan Transit Authority ("MTA") Police Officer Al Ramos ("Officer Ramos") reported that Cole had asked him to say that Pugliese sexually harassed Cole. (Pugliese Dep. 20-21.) Cole reportedly asked Officer Ramos to say that Pugliese spoke of wanting to "fuck [Cole] in the ass" and that Ramos had observed Pugliese massaging Cole's shoulders and buttocks. (Id.) Pugliese was further told by supervisors at Penn Station that Cole had solicited employees there to report that they were harassed by Pugliese. Pugliese reported to his supervisor, Nancy Greer, his belief that Cole was planning to bring false sexual harassment claims against him. The time line is unclear from the record, but Plaintiff alleges that Greer failed to promptly contact appropriate personnel or to investigate, as appears to be required under LIRR policy. (See Defs. SMF ¶ 15; Greer Dep. 46)..

On November 21, 2000, Richard Cole made a complaint to Diversity Management that Pugliese had inappropriately touched him. (Commodore Aff. ¶ 9.) Cole's complaint was investigated by Greer and Sandy Sperry ("Sperry"), the Assistant Manager for Diversity. Pugliese claims that in separate meetings with both Sperry and with Greer, each told him that they did not believe Cole. (Pugliese Aff. ¶¶ 22-23; Pugliese Dep. 53-54.) Greer told Pugliese that supervisors are "in the firing line" and that he should "just let it go." (Id.) By letter dated December 1, 2000, Sperry informed Cole that his allegations of sexual harassment had not been substantiated. (Defs. SMF at 17.) Defendants claim that Sperry and Greer also found no proof

that Cole made false allegations.  (<u>Id.</u> at 19.)

### C.      January 2001: Christopher Glaudino

The next incident occurred with respect to station cleaner Christopher Glaudino, beginning in December 2000.  Glaudino became friendly with Pugliese during that time, buying him lunch at least four times.  (Pugliese. Aff. ¶ 27.)  During a conversation about a female coworker, Glaudino told Pugliese that he had a "nine inch cock" and showed it to Pugliese through his pants.  (Pugliese Aff. ¶ 31.)  Pugliese reportedly called Glaudino "stupid" and asked him to leave.  (<u>Id.</u>)  When Glaudino came into the office on his relief day Pugliese again asked Glaudino to leave.  (<u>Id.</u> at 32.)  Other employees reported to Pugliese that Glaudino felt hurt because of this.  (<u>Id.</u>)

On January 8, 2001, Christopher Glaudino made a complaint to Diversity Management that Pugliese had sexually harassed him.  (Defs. SMF at 20.)  Glaudino alleged that Pugliese had asked to see Glaudino's penis, rubbed his shoulders, and pinched his cheek in November 2000. (Defs. SMF at 20.)  Glaudino also alleged that plaintiff offered him four hours of overtime to see Glaudino's penis, and that in December 2000, Pugliese offered to give Glaudino a computer if he would scan a picture of his penis and give it to Pugliese.  Glaudino also made allegations that after he declined Pugliese's advances, Pugliese was disrespectful to him and told him to look for another job.  (<u>Id.</u>)  Greer and Sperry conducted an investigation of Glaudino's complaint.  (Defs. SMF.)  Pugliese claims that Sperry and Greer told him their conclusion was that Glaudino was unsure of his sexuality, felt rejected by Pugliese, and that is why he brought claims against Pugliese.  (Pugliese Dep. 63-64.)  In writing, they concluded that there was no evidence to substantiate either Glaudino's or Pugliese's complaints.  (<u>Id.</u>)

### D. May 2001: Jerome Petronilia

A final incident took place with respect to LIRR employee Jerome Petronilia. On May 3, 2001, a station cleaner told Pugliese that Petronilia and others referred to him as a "fucking faggot" and a "queer" and claimed that he entered the men's locker room in order to watch them change their clothing. (Pugliese Aff. ¶ 42.) The station cleaner, Larry House, reported to Pugliese that Petronilia had told people not to listen to Pugliese. (Pugliese Dep. 72.) Two other station cleaners also told Pugliese that Petronilia was making disparaging statements about him regarding his sexual orientation. (Pugliese Aff. ¶ 43.) Pugliese reported this to manager Roe Mitchell and asked Larry House also to report it to Mitchell. (Pugliese Dep. 80.) Roe Mitchell reportedly told Pugliese to approach Petronilia himself. Although Pugliese told Greer about the issue, he did not file a written complaint with Greer or with the Diversity committee, because he had not been satisfied with how they had dealt with his past complaints. (Id. 89.) Instead Pugliese filed a grievance with the union. Shortly thereafter, Pugliese used his seniority to transfer to Syosset station. Pugliese alleges that he made less money after the switch.

## II.   STANDARD OF REVIEW

A motion for summary judgment should be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing the absence of a genuine issue of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A fact is material if it "might affect the outcome of the suit under the

governing law." Holtz v. Rockefeller & Co., Inc., 258 F. 3d 62, 69 (2d Cir. 2001) (quoting

Anderson, 477 U.S. at 248). A genuine issue is presented where "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Id. "The nonmovant cannot

escape summary judgment merely by vaguely asserting the existence of some unspecified

disputed material facts, or defeat the motion through mere speculation or conjecture." W. World

Ins. Co. v. Stack Oil, Inc., 922 F.2d 118,121 (2d Cir. 1990) (internal quotations and citations

omitted); see Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the opponent can

only create a genuine issue of material fact by citing competent, admissible evidence. Glasso v.

Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004) (citing Sarno v.

Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir. 1999)).

When deciding a motion for summary judgment, the court must view the evidence in the

light most favorable to the non-moving party and must draw all permissible inferences from the

submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party. See

Anderson, 477 U.S. at 255; Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995).

Furthermore, "[i]n determining whether issues of material fact exist in a discrimination case

where the employer's state of mind is at issue, we affirm sparingly a grant of summary judgment

because careful scrutiny of the factual allegations may reveal circumstantial evidence to support

the required inference of discrimination." Konits v. Valley Stream Cent. High Sch. Dist., 394

F.3d 121, 124 (2d Cir. 2005) (internal citations omitted).

## III. DISCUSSION

Moving Defendants, LIRR, Petronilia and Greer, contend that a summary judgment

should be granted because there is no municipal liability or individual liability under § 1983,

because plaintiff fails to show a violation of his equal protection rights, and because plaintiff's state claims are preempted and fail to demonstrate an adverse employment action. I will address each of these arguments in turn.

### A. Municipal Liability Under § 1983

Municipalities have been considered "persons" for the purpose of § 1983 liability since the Supreme Court reversed its prior prohibition on municipal liability in Monell v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658 (1978). Monell established that municipalities and other local government units could be sued directly under § 1983, as long as they were only held responsible for official policy and not under a respondeat superior theory. Id. at 690-94. "Official policy" can be found one of three ways. First, if acts are "officially sanctioned or ordered" by the municipality, it can be held responsible. City of St. Louis v. Praprotnik, 485 US 112, 123 (1988) (internal citations omitted). Second, a "plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." Id. at 127 (internal citations omitted). Finally, municipalities can be held responsible for unconstitutional actions by individuals with "final policymaking authority" as defined by state law. Id. at 123.

There is no evidence on the record suggesting that either of the first two definitions of official policy are relevant in this case. To the contrary, nondiscrimination is LIRR's stated, official policy. (Defs. SMF ¶ 15.) Furthermore, there has been no evidence presented that there is a widespread practice of ignoring or subverting legitimate discrimination and harassment claims. Contrary to Pugliese's suggestion, evidence that his managers ignored his complaints on

three occasions does not establish that such actions were widespread policy throughout the LIRR.

Nonetheless, whether Nancy Greer acted as a final policymaking authority in dealing with Pugliese's complaints is a closer call. "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003) (citing Rookard v. Health & Hosps. Corp. 710 F.2d 41, 45 (2d Cir. 1983)). Discretionary acts by a supervisor are not sufficient; a plaintiff must show that the individual has final authority over significant matters involving the exercise of discretion. Rumala v. New York City Transit Auth., 02 CV 3828, 2005 U.S. Dist. LEXIS 19766 (E.D.N.Y. Aug. 26, 2005). According to information provided by the LIRR, Nancy Greer is the Terminal Manager in Jamaica/Flatbush Avenue Stations. (Reply Declaration Lundin ("Defs. Reply Decl.") Ex. B, Subpart C at 1.) She answers to the Assistant General Manager of Passenger Services, who in turn answers to the General Manager of Passenger Services. (Id. at 3; Wedley Aff. ¶ 3.) The LIRR's Job Questionnaire for Greer's position states that she has "complete authority" for making decisions related to:

> Selection of new hires, appointed positions, disqualification of employees*,*
> ***discipline of employees to include dismissal;*** overtime, staffing, employee and
> supervisory coverage for events and holidays and unusual capital/engineering
> programs, scheduling and assignment of resources, determining priorities of
> cleaning resources commitment including timing and frequency, invoice
> approval, exceptions to refund policy, delegation of authority, evaluation of
> supervisory personnel, operating budget, internal controls, enforcement of
> rules/regulations of tenants, approval of concessions and public displays, access
> desk staffing.

(Defs. Reply Decl. Ex. B, Subpart C at 4 (emphasis added).) In contrast, Greer's position must refer decisions about corporate policy, final budget, labor agreements, and local police

involvement to others for approval.  (Id.)

The Second Circuit has explained that "[w]here an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.  An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions."  Rookard, 710 F.2d at 4. Fred Wedley, the General Manager of the Department of Passenger Services suggests that since Greer must refer decisions about corporate policy to senior managers, she is not a final policymaker for the LIRR.  (See Wedley Aff.)  It is not required, however, for an individual to have final policymaking authority over *all* decisions.  Rather, an official has the requisite "final policymaking authority" to support a Monell claim if his or her actions constitute a final action on the part of the municipality.  See Jeffes v. Barnes, 208 F.3d 49, 56 (2d. Cir. 2000) (Defendant "need not be a municipal policymaker for all purposes.  Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the [municipality's] business.") (internal citations omitted); McMillian v. Monroe County, Ala., 520 U.S. 781, 785 (1997) ("Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue.").  For example, while a police sergeant's actions taken after answering a 911 call were considered too discretionary to constitute final policymaking authority (Anthony, 339 F.3d at 139-40), a principal charged with failing to investigate students' false sexual harassment complaint against a homosexual teacher has been considered to be a final policymaker for the School District. Lovell v. Comsewogue Sch.l Dist., 214 F. Supp. 2d 319, 324 (E.D.N.Y. 2002).  The relevant standard is one of state law.  McMillan, 520 U.S. at

786.[1]

In this case, the most compelling evidence we have of what the LIRR intended for Greer's role is the job description as provided by the LIRR. Greer's job description states that she has "complete authority" for making decisions regarding "discipline of employees to include dismissal." (Defs. Reply Decl. Ex. B, Subpart C at 4.) Greer had authority to investigate claims of discrimination or harassment, to choose discipline based on her findings, and to dismiss employees. There is no suggestion that those decisions had to be approved by others or that there was an official appeal procedure. It is less clear whether Greer has final policymaking authority directly in investigations of discrimination, since that responsibility is shared with the diversity personnel. However, LIRR policy demonstrates that Greer has final policymaking authority for actions involving discipline, including the *results* of investigations of discrimination. Examining the facts in the light most favorable to the Plaintiff, I find that LIRR has municipal liability and the motion is denied.

**B.     Individual Liability Under § 1983**

Defendants Greer and Petronilia argue that they should not be held individually liable under § 1983 because either they are protected by qualified immunity or lack the requisite personal involvement.

*1.     Qualified immunity*

---

[1] Plaintiff erroneously argues that whether Greer has final policymaking authority is an issue of fact. (Plaintiff's Mem. L. Opp. Summary Judgment ("Pl. Mot.") at 11.) In fact, it is a question of law to be decided by the court, not by a jury. St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988) ("[C]ertainly there can be no justification for giving a jury the discretion to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself.")

Defendants Greer and Petronilia briefly cite to the legal standard for qualified immunity without any reference to what facts or argument would suggest that defendants are protected by qualified immunity in this case. The doctrine of qualified immunity shields government officials from civil liability for "actions taken in their official capacity, if those actions were objectively reasonable in light of clearly established rules then extant." Morris-Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist. 423 F.3d 153, 158, (2d Cir. 2005) (internal citations omitted). Those rules must refer to "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).[2]

At issue is "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 129-30 (2d Cir. 2004) (internal citations omitted) (Finding that the right in question was defined with sufficient specificity and was supported by decisional law of the Supreme Court and Second Circuit). In Carrero v. New York City Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989), the Second Circuit held that Section 1983 could be used to bring an equal protection claim for a hostile work environment. "Therefore, since 1989, it has been clearly established in this circuit that a sexual harassment claim could constitute a violation of the Equal Protection Clause of the Fourteenth Amendment." Lovell, 214 F. Supp. 2d at 57. Sex

---

[2] As a threshold issue, the court must first consider the question that, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). This requirement is examined below, where I find that it is met. Infra.

discrimination in public employment is prohibited by the Equal Protection Clause.  Davis v. Passman, 442 U.S. 228, 234-35 (1979).  The Court ruled in 1996 that discrimination on the basis of sexual orientation could violate the Equal Protection Clause of the Constitution in Romer v. Evans, 517 U.S. 620 (1996).  The existence of a high profile and widely publicized case, such as Romer, is sufficient notice of the potential for a constitutional violation.  See Black, 363 F. 3d at 129-30.  It is, therefore, objectively reasonable that Greer and Petronilia should have been aware of the legal implications of discriminating on the basis of sexual orientation.

Petronilia's alleged conduct (directly undermining Pugliese's authority amongst other cleaners and making offensive remarks about him to employees of LIRR) was sufficiently severe as to make qualified immunity inappropriate.  Reading the record in a manner most favorable to the plaintiff, Greer arguably knew that Cole's and Glaudino's complaints were false and malicious, and went as far as to vocally conclude this to Pugliese while other people were within hearing range, and yet still made an official finding that there was no evidence that their complaints were deliberately false.  She further encouraged him to withdraw his complaint and forget about it.  These actions do not appear to be objectively reasonable.  Thus, Greer is not shielded by qualified immunity.

### 2.    *Petronilia's personal involvement*

The Supreme Court has recognized that an individual is acting under color of state law when exercising power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Polk County v. Dodson, 454 U.S. 312, 317-18 (1981) (internal citations omitted).  Generally, "state employment is ... sufficient to render the defendant a state actor." West v. Atkins, 487 U.S. 42, 49 (1988) (internal citations

omitted).  For purposes of a section 1983 action, a defendant "acts under color of state law when he abuses the position given to him by the State." West, 487 U.S. at 50; see also Christian v. Belcher, 888 F.2d 410, 414 (6th Cir. 1989) ("[B]efore a defendant may be held liable under section 1983, that defendant must first possess power by virtue of state law, then misuse that power in a way that violates federal constitutional rights").

Petronilia was a subordinate, not a supervisor, of Pugliese, and hence is immune from Plaintiff's § 1983 claims.  Plaintiff cites to one Second Circuit case suggesting that co-worker action could be considered to be under the color of state law, but which is easily distinguishable from the case at bar.  Feingold v. New York, 366 F.3d 138, 159 (2d Cir, 2004) ("the deprivations he alleges were under color of state law because they were committed by state employees acting in their official capacities as . . . employees and exercising their responsibilities pursuant to state law.")  In Feingold, the Second Circuit allowed § 1983 claims against individual defendants who were other administrative law judges ("ALJs"), in a case brought by a former ALF.  While it is unclear the extent of authority that the defendants had over the plaintiff in Feingold, it is factually distinguishable from the instant case where defendant Petronilia, a station cleaner is clearly subordinate (even if not directly so) to Pugliese, and did not possess "power by virtue of state law" to then misuse.   Petronilia is therefore GRANTED summary judgment on all Section 1983 claims.

### 3.  *Greer's personal involvement*

"Personal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law.  Thus, '[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the

deprivation of a federal right.'" Hafer v. Melo, 502 U.S. 21, 25 (1991) (citing Kentucky v. Graham, 473 U.S. 159, 166 (1985)).  Greer, in her personal capacity, was acting under the color of state law because she was conducting herself as a supervisor for a public employer.  See Annis v. County of Westchester, 36 F.3d 251, 254 (2d Cir. 1994).

In addition, "a prerequisite to an award of damages for any constitutional tort requires a plaintiff to demonstrate the personal involvement of each named defendant." Martin v. New York State Dept of Correctional Services, 224 F. Supp. 2d 434, 452 (2d Cir. 2002) (internal citations omitted).

> Supervisor liability under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003).  All of the allegations made by Pugliese against Greer fit at least one of these categories.  Pugliese asserts that Greer discriminated against him directly by not responding to his complaints and that she failed to investigate and discipline harassment by Pugliese's co-workers and subordinates.  (Compl. at 6-7.)  If a jury were to credit Pugliese's account of the actions, Greer was sufficiently involved to permit personal liability under § 1983.

## C.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires all States to provide every person within its jurisdiction the equal protection of the laws.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  The purpose of the Equal Protection Clause is

to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination." Sioux City Bridge Co. v. Dakota County, Neb., 260 U.S. 441, 445 (1923). Pugliese alleges that the LIRR and individual defendants violated his equal protection rights by selectively applying the LIRR's anti-harassment policy against him on the basis of his sexual orientation.

In addressing the issue of selective application of the law, the Supreme Court found that:

> though the law itself be fair on its face, and impartial in appearance, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.

Yick Wo v. Hopkins, 118 U.S. 356, 374-75 (1886). The Second Circuit has set forth the following requirements which must be satisfied in order to prove a violation of the Equal Protection Clause under a facially lawful state regulation: (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. FSK Drug Corp. v. Perales, 960 F.2d 6, 10 (2d Cir. 1992).

### 1.    Standard of Review

Under an equal protection claim, an individual who is part of a "suspect class," will trigger a strict scrutiny analysis of the statute or, in the case of a facially neutral law, its application. Kadrmas v. Dickinson Pub. Sch., 487 U.S. 450, 457 (1988). The Supreme Court has also recognized that classifications based on gender call for a heightened standard of review.

United States v. Virginia, 518 U.S. 515, 531-33 (1996). While gender classifications do not trigger strict scrutiny review as they are considered only "quasi-suspect," "for a gender-based classification to withstand equal protection scrutiny, it must be established at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." Tuan Anh Nguyen v. Immigration & Naturalization Serv., 533 U.S. 53, 60 (2001). Under its current equal protection jurisprudence, however, the Supreme Court does not consider classifications based on sexual orientation as being part of a suspect class, like those based on race and national origin, or quasi-suspect class, like those based on gender. See Romer v. Evans, 517 U.S. 620, 631-32 (1996). Accordingly, the constitutionality of a classification based on sexual orientation must be considered under a rational basis test. Id. Under the rational basis test, the classification by the state or state actor will be upheld so long as it advances a legitimate state interest and is rationally related to that particular government interest. Id. at 622. If a group possesses "distinguishing characteristics relevant to interests the State has the authority to implement," a State's decision to act on the basis of those differences cannot run afoul the Equal Protection Clause. Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001).

While rational basis review is a relatively low standard, it is by no means a free pass to exoneration. Under rational review, the Supreme Court has held that a law or the application of a law cannot survive if "born of animosity toward the class of persons affected." Romer, 517 U.S. at 634. In City of Cleburne, 473 U.S. 432 (1985), the Supreme Court, employing a rational basis test, unanimously held that the denial of a special use permit to Cleburne Living Centers, Inc., a group home for the mentally retarded, was premised on an irrational prejudice, and thus

unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.  While the

Supreme Court declined to grant the mentally retarded the status of a "quasi-suspect class," it

nevertheless found that the "rational relation" test for legislative action provided sufficient

protection against invidious discrimination.  Id. at 442.  See also Quinn v. Millsap, 491 U.S. 95,

107 (1989).

Similar to that of the mentally challenged in City of Cleburne, 473 U.S. 432, the Supreme

Court's refusal to recognize homosexuals as a quasi-suspect class does not leave them entirely

unprotected from invidious discrimination.  In Romer, the Supreme Court declared that

Amendment 2, an amendment to the State Constitution of Colorado adopted by Colorado voters

which precluded any judicial, legislative, or executive action designed to protect persons from

discrimination based on their "homosexual, lesbian, or bisexual orientation, conduct, practices or

relationships," was an unconstitutional violation of the Equal Protection Clause.  517 U.S. at

624-26.  The Court ruled that the "sheer breadth of the amendment was so discontinuous with the

rationale offered for it that the amendment seems inexplicable by anything but animus toward

the class that it affects."  Id. at 633.  Rejecting the State's rationales that Amendment 2 merely

put gays and lesbians in the same position as all other persons and respect for its citizens'

freedom of association, the Court declared that "if the constitutional conception of equal

protection of the laws means anything, it must at the very least mean that a bare desire to harm a

politically unpopular group cannot constitute a legitimate governmental interest."  Id. at 634.

When conducting rational basis review, government action will not be overturned unless

the varying treatment of different groups or persons is so unrelated to the achievement of any

combination of legitimate purposes that the only conclusion explaining the government's actions

is that they were irrational.  <u>Kimel v. Fla. Bd. of Regents</u>, 528 U.S. 62 (2000).  In the absence of

non-legitimate or irrational purposes, such as hostility towards an unpopular group, the State

does not have to explain its reasoning at the moment a particular decision is made.  <u>Bd. of</u>

<u>Trustees of Univ. of Ala.</u>, 531 U.S. at 367.  In such a situation, deference is given to the

government and the classification in question is deemed to be presumptively valid, leaving the

individual challenging the constitutionality the burden of negating "any reasonably conceivable

state of facts that could provide a rational basis for the classification."  <u>Id.</u>

>    *2.    Analysis*

For Pugliese's equal protection claim to survive summary judgment review, it must be

shown that he was, compared with others similarly situated, selectively treated, and the selective

treatment was motivated by an intention to discriminate on the basis of impermissible

considerations, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad

faith intent to injure the person.  <u>FSK Drug Corp.</u>, 960 F.2d at 10.  The selective treatment of

which Pugliese has complained is not an official policy of discrimination, as it was in <u>Romer</u>.

Nonetheless, if all issues of fact were decided in Pugliese's favor, including that the LIRR was

motivated by an intention to discriminate, an equal protection violation did occur.  <u>See</u> <u>Romer</u>,

517 U.S. at 632; <u>Cleburne</u>, 473 U.S. at 446.

Under the first prong of the Second Circuit test, which requires that the plaintiff be

selectively treated compared to others similarly situated, LIRR appears to have selectively

treated Pugliese compared to others that were similarly situated.  For example, while complaints

by Glaudino and Cole were promptly and fully investigated by management in accordance with

LIRR policy, Pugliese's complaint was not promptly, and perhaps not fully, investigated.

Harassment against him was, in essence, tolerated.  In <u>Giordano v. City of New York</u>, the plaintiff, an officer in the New York City Police Department, was discharged from service following a recommendation of discharge by the Police Pension Fund Medical Board because of his life-long need for an anticoagulent medicine, Coumadin.  274 F.3d 740, 742 (2d. Cir. 2001).  The court ruled that discharging Officer Giordano while employing another officer taking the same medicine amounted to selective treatment that would satisfy the first prong.  <u>Giordano</u>, 274 F.3d at 751.  Likewise, Pugliese contends that his complaints about sexual harassment were ignored while similar complaints against him were investigated.

Whether this selective treatment amounted to a constitutional violation will rest on the second prong, of whether the LIRR or individual defendants had discriminatory intent.  While the NYPD's rationale for its disparate treatment of Rowe and Giordano in <u>Giordano</u> was, as the Second Circuit characterized, "nebulous," the Second Circuit granted summary judgment in favor of the defendants, holding that no evidence in the record on appeal suggested any "impermissible motive."  <u>Id.</u> at 751.  There was no evidence that the physicians on the Medical Board who examined Giordano and recommended his termination, or the police commissioner who ultimately terminated Giordano, had any knowledge of Officer Rowe's medical condition or of the condition of anyone else retained as an NYPD police officer.  As a result, the Second Circuit held that no reasonable juror could infer that the defendants intended to treat Giordano differently from other NYPD officers, hence found no constitutional violation.  <u>Id.</u>

Similar to the case in <u>Giordano</u> where defendants' motivation was "nebulous," the defendants in the present case do not offer any rationale for selective treatment, instead contending that they did not treat Pugliese differently.  <u>Giordano</u>, 274 F.3d at 751.  However

unlike in <u>Giordano</u>, where there was no evidence that the defendants knew of other similarly situated police officers when they discharged Giordano, Greer knew of Pugliese's sexual orientation when she chose not to investigate his complaints, while following LIRR guidelines in investigating claims by Cole and Glaudino.  <u>Id.</u>  In further support of the possibility that the defendants acted with improper motive are the allegations that Greer told Pugliese one thing, while officially reporting another, and that Greer was acting against the LIRR's stated policy when she chose not to investigate or officially credit Pugliese's complaints.

Although Pugliese does not offer strong evidence for the contention that the defendants had a discriminatory intention, neither is the record devoid of evidence suggestive of malicious intent.  Given that there is a factual dispute and that decisions of motivation are commonly left to the jury, I deny the motion for summary judgment on the grounds that Pugliese has no basis for an equal protection claim.

### D.      New York City Human Rights Law

The Plaintiff brings  hostile work environment and adverse employment action claims pursuant to Chapter I, Title 8 of the Administrative Code of the City of New York, § 8-107 ("City Human Rights Law" or "CHRL"), which, in pertinent part, provides that it shall be an unlawful employment practice:

> For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

New York, N.Y. ("City") Admin. Code § 8-107(1)(a).  Claims pursuant to CHRL may be

brought to the City Commission on Human Rights or before any court of competent jurisdiction. See City Admin. Code § 8-109.

       *1.*       *Jurisdiction under New York State Public Authority Law*

Contrary to the moving Defendants' assertion, the LIRR is not exempt from the jurisdiction of the New York City Human Rights Commission pursuant to N.Y. Pub. Auth. Law § 1266(8) as applied to LIRR by N.Y. Pub. Auth. Law § 1266(5). The New York Transportation Act, N.Y. Pub. Auth. Law § 1266(5), grants to each MTA subsidiary "all of the privileges, immunities, tax exemptions and other exemptions" of the MTA. Id. As recently amended, N.Y. Pub. Auth. Law § 1266(8) states, in pertinent part, that "no municipality or political subdivision, including but not limited to a county, city, village, town or school or other district shall have jurisdiction over any facilities of . . . New York City Transit Authority . . . or any of its operations." Id.

However, as held by the New York Court of Appeals in Levy v. City Comm'n on Human Rights, 85 N.Y.2d 740 (1995), the Public Authorities Law will only exempt the MTA from the reach of local laws that "interfere with the accomplishment" of the MTA's purpose. Compliance with local human rights law does not interfere with NYCTA's purpose. See Walhstrom v. Metro-North Commuter R.R. Co., 98 F. Supp. 2d 506, 527 n.21 (S.D.N.Y. 2000) (adopting the New York Court of Appeals holding that the Public Authorities Law is consistent with the Administrative Code, and finding that the state legislature had not preempted the area of human rights).

       *2.*       *Hostile Work Environment*

Claims brought under City Human Rights Law are analyzed using state and federal rights

statutes yet are independent from those legal frameworks.  Claims brought under the City Human

Rights Law have traditionally been subject to the same analytical framework as claims brought

under Title VII.  See e.g., Pace v. Paris Maint. Co., 107 F. Supp. 2d 251, 266 (S.D.N.Y. 2000)

(stating "there is no difference between the rights granted under the CHRL and the rights granted

under the New York HRL and no difference in 'the manner or amount of proof required'")

(citing Buckhout v. New York City Comm'n on Human Rights, 609 N.Y.S.2d 608 (1st Dep't

1994)).  However, the amendments to the CHRL made by the Local Civil Rights Restorations

Act (Local Law 85 of 2005) dictate that:

> [T]he provisions of New York City's Human Rights Law are to be construed
> independently from similar or identical provisions of New York state or
> federal statutes. Interpretations of New York state or federal statutes with
> similar wording may be used to aid in interpretation of the New York City
> Human Rights Law, viewing similarly worded provisions of federal and state
> civil rights laws as a floor below which the City's Human Rights law cannot
> fall, rather than a ceiling above which the local law cannot rise.

N.Y.C. Local Law No. 85 of 2005, § 1 (Oct. 3, 2005).  Thus, Title VII jurisprudence is a useful

guide for CHRL claims, but does not control the analysis of CHRL claims.  It is useful to begin

this analysis with an examination of Title VII.

Under Title VII, to prevail on a claim of hostile work environment, a plaintiff must show

that he was subjected to harassment based on his sexual orientation and that the harassment was

so severe or pervasive as to "alter the conditions of [his] employment and create an abusive

working environment."  Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986).  "Even if the

plaintiff succeeds in presenting a prima facie case, the defendant may rebut that showing by

articulating a legitimate, non-discriminatory reason for the employment action."  Weinstock v.

Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citations omitted).

a. *LIRR's  Potential Liability for Discriminatory Conduct by Employee*

CHRL provides that an employer may be liable for discriminatory conduct by an employee where:

1. The employee or agent exercised managerial or supervisory responsibility; or

2. The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

3. The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

City Administrative Code § 8-107(13)(b).  In addition, under Title VII, employers can be held liable for a "discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing harassment by the existence of [an] agency relationship."  Karibian v. Columbia Univ., 14 F.3d 773, 780 (2d Cir. 1994), cert. denied, 512 U.S. 1213 (2d Cir. 1994).

 In the present case, LIRR may be held vicariously liable for the actions of employee Greer because, as Pugliese's former manager, she exercised managerial or supervisory responsibility.  See § 8-107(13)(b)(1).  For all the reasons stated supra, Petronilia is not a supervisor and so summary judgment is granted for CHRL claims against Petronilia.

b. *Severity and Pervasiveness*

Summary judgment should not be granted because a material question of fact exists as to

whether the Plaintiff was placed in a hostile work environment.

Under Title VII analysis, the number of harassing incidents is not dispositive to a finding of hostile work environment. Whether an environment "would reasonably be perceived, and is perceived, as hostile or abusive . . . is not, and by its nature cannot be, a mathematically precise test." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22-23 (1993); Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). An appropriate determination requires an examination of the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff's work performance." See Harris, 510 U.S. at 23. As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Perry, 115 F.3d at 149 (citation and internal quotation marks omitted). However, a single act can be sufficient to create a hostile work environment if, by itself, it can and does work a transformation of the plaintiff's workplace. See e.g., Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (finding a hostile work environment was created when a vile and sexually explicit verbal abuse of a female firefighter that challenged her competence, was witnessed by a large group that included her subordinates, and created a justified fear that she would be left in peril at fire scenes); Richardson v. New York State Dep't of Corr. Servs., 180 F.3d 426, 437 (2d Cir. 1999) (observing that a single sexual assault may be sufficient to alter the terms and conditions of the victim's employment).

Moreover, the CHRL must be interpreted broadly and independently. See N.Y.C. Local Law No. 85 § 7. Notably, although Title VII analysis is instructive in CHRL matters, the

breadth and scope of CHRL will often yield results different from Title VII.  See e.g., Patane v. Clark, 05 CV 10219, 2006 U.S. Dist. LEXIS 42581 (S.D.N.Y. Jun. 21, 2006) (finding that individual liability was not permitted under Title VII; however, it was permitted under the CHRL against individuals who had supervisory power or who had actual participation in or aiding and abetting an employer's retaliatory conduct).

In the instant case, the record does not give rise to any single determination regarding the severity of the allegedly discriminatory circumstances.  In particular, based on my review, the factual record is sufficient to support the determination that the Plaintiff found the behavior of LIRR employees at the Station to be threatening, but whether the behavior was objectively so is a matter open to inference.

<i>c.     Adverse Employment Action</i>

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quotations and citation omitted).  "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999); see also Bernheim v. Litt, 79 F.3d 318, 324-26 (2d Cir. 1996) (finding that adverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities); Patrolmen's Benevolent Assoc. v. City of New York, 00 CV 9538, 2002 U.S. App. LEXIS 21656, at *6 (2d Cir. Oct. 17, 2002) (holding that

lateral transfer can be an adverse employment action so long as the transfer "alters the terms and conditions of the plaintiff's employment in a materially negative way"). On the other hand, to be materially adverse, the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya, 202 F.3d 636, 640 (citation omitted); see also Wanamaker v. Columbian Rose Co., 108 F.3d 462, 466 (2d Cir. 1997) (finding that "not every unpleasant matter . . . creates a cause of action"); Mudholkar v. Univ. of Rochester, 2000 U.S. App. LEXIS 25208 (2d Cir. 2000) (reorganization not adverse action where employee had same responsibilities, pay, and tenure); Dunphy v. Delta Airlines, Inc., 290 F. Supp. 2d 311 (E.D.N.Y. 2003) (denial of transfer closer to employee's home is not an adverse employment action).

Pugliese alleges in his complaint that his transfer to another station, although made by his own volition, was the only way to escape the harassment he was experiencing, as his supervisors were not punishing the perpetrators. He further alleges a drop in salary, as well as certain personally adverse results. Whether Pugliese's salary in Syosset station could be considered a reduction in pay, or whether his lateral transfer could be considered a demotion or otherwise material adverse change in his employment, are questions of material fact. As a result, I deny the Defendants' motion for summary judgment on this ground.

**E.** **Implied Covenant of Good Faith**

Moving Defendants argue that Pugliese's claims based on the implied covenant of good faith are exclusively within the province of the Railway Labor Act's dispute resolution procedure. (Defs. Mot. 19.) Plaintiff counters that his claim is not "inextricably intertwined" with the collective bargaining agreement, and therefore exempt from the Railway Labor Act's procedures. (Pl. Resp. 24.)

Where state law claims depend on the interpretation of a collective bargaining agreement ("CBA"), the Railway Labor Act preempts the state law claim.  Railway Labor Act, 45 U.S.C. § 151; Shafii v. British Airways, PLC, 83 F.3d 566, 569-70 (2d Cir. 1996).  The Railway Labor Act, in turn, requires the arbitration of disputes regarding a CBA before they can be brought into court.  See 45 U.S.C. § 151a.

Nonetheless, the Supreme Court has held that the RLA, similar to the Labor Management Relations Act (LMRA), does not require pre-emption "beyond suits for breach of contract, [because it] would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 260-61 (1994) (quoting Allis-Chalmers Corp v. Lueck, 471 U.S. 202, 211-12 (1985) (LMRA case)).  The Court further reasoned that "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent.'" Id. at 262 (quoting Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 400-10 (1988)).  The Second Circuit has further limited the pre-emption effect of the RLA beyond that of the LMRA, holding that a state law claim requiring the resolution of a minor dispute under the RLA is not entitled to complete pre-emption.  Sullivan v. Am. Airlines, Inc., 424 F.3d 267, 276 (2d Cir. 2005); Atanasio v. Bhd. of Locomotive Eng'rs & Trainmen, 424 F. Supp. 2d 476, 482 (E.D.N.Y. 2006) (Trager, J.).

In this case, moving Defendants have not shown how the interpretation of the CBA is necessary in order to resolve Pugliese's third claim. It is not clear from the motion papers how the CBA would be involved in a claim purporting to hold LIRR to its own anti-discrimination policies. The motion is therefore denied.

## IV.    Punitive Damages

Defendants move for summary judgment because Defendant lacks basis for punitive damages. (<u>See</u> Defs. Mot. *ii.*) Plaintiff responds that the City Human Rights Law does allow punitive damages where there has been intentional discrimination with malice and reckless indifference. (Pl. Resp. 25;) <u>LaMarch v. Tishman Speyer Properties</u>, slip op., 2006 WL 2265086**.** I hereby DENY the motion because of the moving Defendants' failure to apprise the court of their rationale.[3]

## V.    Conclusion

For the reasons set forth above, the moving Defendants' motion for summary judgment is GRANTED in part and DENIED in part. LIRR's motion for summary judgment of § 1983 claims is DENIED. Petronilia's motion for summary judgment of § 1983 claims is GRANTED for lack of state authority. Greer's motion for summary judgment of § 1983 claims is DENIED. Defendants' motion for summary judgment of § 1983 claims because Plaintiff lacks an equal protection claim is DENIED. Defendants' motions for summary judgment of CHRL claims are DENIED. Defendants' motion for summary judgment of the good faith and fair dealing claim is

---

[3] The court notes that this section is identified in the Table of Contents as being on page 20. However, the Memorandum of Law submitted by moving Defendants does not contain a page 20. (<u>See</u> Def. Mem. Law.)

DENIED.  The Defendants' motion on punitive damages is DENIED.  All complaints against

defendants Cole and Glaudino are dismissed without prejudice for lack of service.  This case is

referred to Magistrate Judge Marilyn D. Go for a conference in order to prepare a pretrial order.

Parties are to advise the court within 30 days of whether they consent for this case to be tried by

Magistrate Judge Marilyn D. Go or a magistrate judge to be selected at random.


SO ORDERED:

_____/s/_____
Nicholas G. Garaufis
United States District Judge

Dated: September 19, 2006
         Brooklyn, New York